Nick C. SPANOS, Plaintiff-Appellee,

v.

SKOURAS THEATRES CORPORATION, Theatre & Cinema, Inc., Philhamboro, Inc., Youngstown Theatre Corporation and Modern Playhouses, Inc., Defendants-Appellants.

No. 4, Docket 29430.

United States Court of Appeals Second Circuit.

Argued Dec. 8, 1965.

Decided March 18, 1966.

On Reconsideration in Banc Aug. 2, 1966.

Lumbard, Chief Judge, and Smith, Circuit Judge, dissented.

Richard Gyory, New York City (Levin, Kreis, Ruskin & Gyory, New York City, on the brief), for plaintiff-appellee.

Milton C. Weisman, New York City, (Adolph Kaufman, Leonard H. Dickstein, Weisman, Celler, Allan, Spett & Sheinberg, New York City, on the brief), for defendants-appellants.

On reconsideration in banc:

Levin, Kreis, Ruskin & Gyory, New York City (Kissam & Halpin, Leo T. Kissam, Richard Gyory, Anthony S. Genovese, New York City, of counsel), for plaintiff-appellee.

Weisman, Celler, Allan, Spett & Sheinberg, Milton C. Weisman, Adolph Kaufman, and Leonard H. Dickstein, New York City, for defendants-appellants.

Albert R. Connelly, New York City, for Association of Bar of City of New York, amicus curiae.

Bernard A. Grossman, New York City, for Federal Bar Ass'n of New York, New Jersey and Connecticut, amicus curiae.

Daniel M. Shientag, New York City (Sidney Pepper, New York City, of counsel), for New York County Lawyers' Ass'n, amicus curiae.

James Amadei, New York City, and others, for New York State Bar Ass'n, amicus curiae.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

LUMBARD, Chief Judge:

The principal question for decision is whether an out-of-state attorney can recover for legal services rendered in an antitrust suit in a New York federal court when he has not been admitted to the bar of New York State or of the federal court.

Defendants, Skouras Theatres and inter-related companies, appeal from a judgment in a diversity suit in the Southern District Court awarding Nick C. Spanos $89,606.29 as additional fees for legal services performed from 1953 to 1958 in connection with an antitrust suit instituted by the defendants in the Southern District Court, and dismissing defendants' counterclaim for the return of $83,013.49 already paid, plus interest.[1]

The trial court, after finding that diversity of citizenship existed because Spanos was not a New Yorker, held that plaintiff's failure to become a member of the New York bar did not preclude his recovering legal fees earned in connection with federal antitrust litigation in New York. We agree with the lower court that diversity jurisdiction existed, but find that his failure to enter a special appearance in the federal court prevents recovery.

---

1. No appeal is taken by plaintiff from the dismissal of his first count based on an alleged contract for a 17½ percent contingent fee. The trial judge found a contingent fee had been promised but that the amount had not been agreed upon.

Because of our disposition the issues on appeal are limited, and the facts, fully set forth in Judge Wyatt's careful opinion, 235 F.Supp. 1 (S.D.N.Y.1964), can be summarized briefly. Spanos graduated from law school in 1947, having written a research paper about the movie industry and the antitrust laws. After a year in New York working in the motion picture antitrust field, he went to California where on January 4, 1949 he became a member of the California bar and commenced practice.

Spanos' success in winning a large treble damage award in a suit conducted in California and Missouri federal courts brought him to the attention of George Skouras, the dominant figure in the movie theatre companies which are defendants here. Skouras planned to bring a similar suit (known as the "industry suit") against the major movie producers for violation of the antitrust laws in the New York metropolitan area. Preparation of that case, which involved three law firms in addition to the companies' house counsel, had already begun and a draft complaint had been circulated among the proposed defendants, leading to settlement negotiations with one.

Skouras requested that Spanos confer with him in New York City late in 1952 and he persistently sought to bring him into the litigation despite Spanos' hesitancy. In the spring of 1953 Spanos made four trips to New York to attend settlement conferences and in California he did research work on the suit. Letters in June 1953 from Skouras to Spanos and from Spanos to James M. Landis, one of Skouras' lawyers, show that Spanos had agreed to work on the industry suit in association with Dean Landis for an undetermined part of Landis' contingent fee and with a minimum yearly guarantee of $15,000 as long as the industry case remained pending.[2] Spanos agreed to "move my principal place of business and my residence to New York City" by January 4, 1954.

Although Spanos worked extensively on the industry case, he did not move to New York until 1955. In 1956 Landis' firm withdrew, leaving Spanos' status uncertain. The trial judge found that Skouras then renewed the promise of a contingent fee and a $15,000 yearly minimum with the amount of the contingent fee again left open. Spanos' activities, however, decreased greatly thereafter, and when in August 1958 Skouras' lawyers negotiated a settlement with two of the defendants in the industry suit Spanos only learned about it through the newspapers in September. When he wrote to Skouras Theatres demanding payment of his contingent fee, Skouras discharged him. Spanos brought this action a year later on October 13, 1959.

## I.

Diversity jurisdiction in this case exists unless Spanos was a citizen of New York when the suit was commenced since the defendants are corporations with their principal place of business in New York. We agree with the district court that he was not a New Yorker.

When the suit began Spanos was resident in Missouri, having moved there in the summer of 1959 with his family. However, he declared at trial that his residence was temporary because he intended to return to California.

Domicile, on which citizenship is based, consists of residence in fact, coupled with the purpose to make the place of residence one's home. State of Texas v. State of Florida, 306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817 (1939). An old domicile continues even though a new residence is established until there is the intention to create a new home. Desmare v. United States, 93 U.S. 605, 23 L.Ed. 959 (1877); Restatement of the Law of Conflicts of Law § 23.

---

**2.** The defendants here agreed to guarantee the fee. For a short time Landis made the monthly payments of the minimum fee to Spanos and was reimbursed by Skouras; after September 1953 the checks came directly from Skouras Theatres.

Appellants contend that Spanos could not have been a California citizen because he had abandoned all residence there in 1955, but by that standard he would not have been a citizen of New York in October 1959 either. Unless his domicile in California was superseded by one in New York, his absence from California would be irrelevant. Thus the district court was called upon to determine whether Spanos intended to make New York his home at any time while he was living there. There is no evidence at all as to where he voted and paid taxes, or about his social contacts, nor any contemporaneous statements as to his intent. Appellants can only point to Spanos' New York residence—and, after his marriage in 1956, to that of his wife and family—and to the fact that New York was his principal place of business.

On the other hand, Spanos never applied to become a member of the New York bar although he could have applied for admission on motion after six months' residence in New York.[3] His contacts with California continued: he maintained an office in Los Angeles continuously, hired associates there, and made frequent trips to the West Coast. During 1955–1957 he received fees of at least $347,000 for cases conducted outside of New York. The trial judge found that "[h]is purpose in coming to New York was in connection with the services for which he here sues. It seems fair to infer that his intention was to give up any residence in New York when these services were concluded." We accept this finding.

## II.

Spanos' right to any recovery presents a more difficult problem. New York implements its strong policy against the practice of law in New York by persons not licensed and admitted to practice by the state, New York Penal Code McKinney's Consol.Laws, c. 40, § 270, by refusing to permit suit for the recovery of fees for such unlawful practice. Spivak v. Sachs, 16 N.Y.2d 163, 263 N.Y.S.2d 953, 211 N.E.2d 329 (1965).

The district court granted recovery on the ground that Spanos' admitted legal services were a "solitary incident" rather than a continuing course of conduct, and thus did not constitute the "practice" of law as defined and made unlawful by § 270. Alternatively, it held that New York could not prevent compensation of an attorney concerning a matter dealing solely with federal law in a federal court.

The *Spivak* case, upon which Judge Wyatt relied to construe the scope of the word "practice" in the New York statute, was overruled on October 21, 1965. Spivak v. Sachs, supra, rev'g, 21 A.D.2d 348, 250 N.Y.S.2d 666 (1st Dept. 1964). In that case, Spivak, a California lawyer, came to New York at the request of a client—who knew that he was not admitted to practice in New York or Connecticut—to give advice on the terms of a property settlement and the handling of a divorce suit already begun in Connecticut. He conferred with the client and her New York lawyers over a period of two weeks. The Court of Appeals rejected the decision of the lower court that these legal services were a "single, isolated incident" rather than the "practice" of law and reversed the judgment awarding compensation. "To say that [Spivak's activity] falls short of the 'practice of law' in New York is to defeat section 270 and the policy it represents," Chief Judge Desmond declared. "The statute aims to protect our citizens against the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." 16 N.Y.2d at

**3.** Under New York Court of Appeals Rule VII–1, Rules for Admission of Attorneys and Counsellors-at-Law, the Appellate Division may admit without an examination persons who were admitted and had practiced for five years before the highest law court or highest court of original jurisdiction of the state in which they resided, after they had resided in New York six months. Spanos had been a member of the California bar for over six years when he moved to New York in 1955.

167–168, 263 N.Y.S.2d at 956, 211 N.E.2d at 331. In light of that decision, Spanos' activities over a six-year time span, even though related to a single case, must now be considered practicing law.

The New York decisions hold that unlawful practice includes counseling as well as court appearances. People v. Alfani, 227 N.Y. 334, 125 N.E. 671 (1919). And it extends to advice involving federal law as well as New York law. In In re Bercu, 273 App.Div. 524, 78 N.Y.S.2d 209 (1st Dept. 1948), aff'd 299 N.Y. 728, 729, 87 N.E.2d 451 (1949) the court restrained an accountant from advising on a matter of federal tax law. Recently the Court of Appeals affirmed an order restraining a Mexican lawyer from giving advice about Mexican divorce law, declaring that "[w]hether a person gives advice as to New York law, Federal law, the law of a sister State, or the law of a foreign country, he is giving legal advice" in violation of the statute. In re Roel, 3 N.Y.2d 224, 229, 165 N.Y.S.2d 31, 35, 144 N.E.2d 24, 26 (1957).

The broad sweep of New York decisions culminating in *Spivak* makes it clear that virtually no legal services may be rendered in New York by a person not admitted to the state bar except for "customary and innocuous practices" in transactions only "somehow" tied to New York. Spivak v. Sachs, supra, 16 N.Y.2d at 168, 263 N.Y.S.2d at 956. In this regard it is important to note that Spanos was not merely consulting with his clients' local lawyers, a practice which indeed is common. Spanos, according to the trial judge, "worked directly with the Skouras companies and independently of Landis. Certainly he was not under any supervision of Landis and their association was in name only. Spanos put it in a letter in July 1953 that his hiring was to be 'full and equal' with Weisman, Sherpick and Landis." 235 F.Supp. at 7. "[T]he 'association' between Landis and Spanos was only on paper; and from the beginning Spanos had been dealing di-

rectly with George [Skouras] and the Skouras companies." 235 F.Supp. at 8. However broadly the exception for normal inter-state practice may be interpreted, certainly five years of work on an important legal matter for New York plaintiffs in a case involving antitrust violations which occurred in the New York area would be prohibited. The New York courts would refuse to grant recovery to Spanos if it were within their power to do so.

### III.

Because the advice Spanos gave was related to federal antitrust law in connection with litigation filed and pending in a federal court,[4] Judge Wyatt held that federal law must govern whether Spanos could recover for his services so that "local policy [could not] obstruct the conduct of business in federal courts." The question is to what extent the federal government has exercised its power and whether Spanos qualified to receive its benefits.

We agree with Judge Wyatt that it is within the power of the federal government to determine who will be permitted to practice in its courts and that this includes allowing compensation for services rendered in regard to litigation in the federal courts. This was the teaching of Sperry v. State of Florida ex rel. The Florida Bar, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), where the Supreme Court held that the state law against unauthorized practice could not apply to appearances by a layman licensed by the U. S. Patent Office to practice before it. But the court restricted its holding to a very narrow range of permissible activities and recognized the states' role: "Nor do we doubt that Florida has a substantial interest in regulating the practice of law within the State and that, in the absence of federal legislation, it could validly prohibit non-lawyers from engaging in this circumscribed form of patent practice. But 'the law of the State, though enacted in the

---

4. The complaint was filed June 3, 1953. It was dismissed with leave to amend in

July 1953 and an amended complaint was filed in September 1953.

exercise of powers not controverted, must yield' when incompatible with federal legislation." 373 U.S. at 383–384, 83 S. Ct. at 1325, 10 L.Ed.2d at 431. The basis for federal preemption was found in the long history and implied Congressional approval of patent practice by laymen, including an administrative licensing scheme.

Although the First Congress acted on the premise of federal power and delegated regulation of counsel to the courts in Section 35 of the Judiciary Act of 1789, now 28 U.S.C. § 1654,[5] the courts for the most part have been content to leave the regulation of attorney qualifications in the first instance to the state in which each court sits. However, it has been held that lawyers admitted to practice in a federal court are not automatically disbarred when the state has disbarred them. Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). It is implicit in those decisions that a person not licensed to practice in a state can practice law in the federal courts of that state. See Ginsburg v. Kovrak, 392 Pa. 143, 139 A.2d 889, appeal dismissed for want of a substantial federal question, 358 U.S. 52, 79 S.Ct. 95, 3 L.Ed.2d 46 (1958).

More important, the rules of the federal courts concerning admission of attorneys have long recognized that experts in federal law should be permitted, when appropriate, to conduct litigation in the federal courts regardless of whether they have been admitted to practice in the state in which the court sits. The rules of the federal district courts in New York State do not restrict admission to members in good standing of the New York bar.[6] All four district courts permit admission *pro hac vice* of any attorney who is a member of the bar of any state. E. g., Rule 3(c), General Rules, Southern and Eastern Districts of New York.[7] These rules express a policy that the New York federal courts, which are open to litigants from all parts of the country and which deal with matters of national interest often unconnected with state law, should not limit the practice before them to attorneys of a single state. Obviously the proper conduct of litigation in our federal courts would be frustrated unless the federal policy were paramount.

Thus Spanos could have applied for leave to appear in the industry suit in the Southern District Court under Rule 3(c). Had he been admitted he would be entitled to reasonable compensation despite the contrary policy in New York.

Unfortunately, however, Spanos did not apply for admission under Rule 3

5. "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel, as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

6. Rule 3(a) of the Southern and Eastern District Courts allows admission of "a member in good standing of the bar of a United States district court in New Jersey, Connecticut or Vermont and of the bar of the State in which such district court is located, provided such district court by its rules extends a corresponding privilege to members of the bar of this court." The rules of the district courts of Connecticut and Vermont do extend corresponding privileges to members of the New York district courts; the New Jersey district court does not.

Rules 2(c) of the Northern and Western District Courts allow admission upon motion by a member of the court to a member of any district court provided he is also admitted to practice in the highest court of the state in which he maintains an office.

At least 20 district courts permit general admission to lawyers not admitted in the state in which the court sits.

7. "A member in good standing of the bar of any state, or of any United States district court, may upon motion be permitted to argue or try a particular cause in whole or in part as counsel or advocate. Only an attorney or proctor of this court may enter appearances for parties, sign stipulations or receive payments upon judgments, decrees or orders."

(c).[8] Judge Wyatt thought this was of no consequence, declaring that application was a mere formality, that Spanos would have been admitted as a matter of course, and therefore permitted him to recover. We do not think Spanos' failure to be admitted *pro hac vice* can be excused in this way. Clearly admission was called for; as Judge Wyatt's opinion makes clear, Spanos was not operating under the supervision or control of the other attorneys. We cannot presume that application would be a formality in every case because there may be circumstances which might well lead a court to deny admission, a matter which many cases declare to be within "the sound judicial discretion of the trial court." Atchison, Topeka and Santa Fe Ry. Co. v. Jackson, 235 F.2d 390 (10 Cir. 1956). And we can hardly believe that the admission of lawyers to participate in protracted litigation is a matter to be treated lightly, especially in view of New York's evident concern to uphold the standards of practice in the state. Therefore it would be inadvisable to lay down a rule which, in many instances, would require other federal or state courts to speculate whether a particular district court would or would not have admitted a particular attorney. Considering that the primary responsibility for the regulation of those who may practice law lies with the state and that an exception from such regulation for persons conducting federal litigation exists only because of the federal statute and rules of the district courts, we feel compelled to limit recovery for services to attorneys who have fully complied with the rules creating the exception of which they seek to take advantage.

Nor do we think it would be proper for the Southern District Court to have admitted Spanos *nunc pro tunc* after October 13, 1958, even though the industry suit was still pending. Rule 3(c) is to permit attorneys to appear before the court; having been discharged from the case, the only purpose in admitting Spanos would be to legitimatize his earlier activities so that he could recover his fees.

The defendants counterclaimed for the return of the $83,013.49 which they had already paid Spanos for his services, plus interest. The district court denied the counterclaim and the defendants have appealed this ruling. The New York rule in such a case is to leave the parties as they are. Spivak v. Sachs, supra, 16 N.Y.2d at 168, 263 N.Y.S.2d at 957, 211 N.E.2d at 331.

The judgment of the district court is reversed insofar as it awarded Spanos $89,606.29 and affirmed insofar as it dismissed the counterclaim of the defendants. The complaint is dismissed.

FRIENDLY, Circuit Judge (dissenting as to the claim and concurring as to the counterclaim):

The compulsion felt by my brothers to apply the New York Court of Appeals' *Spivak* decision to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observation as to the occasional predilection of the best of judges for "a strong decision," to wit, one "opposed to common-sense and to common convenience."[1] I do not believe a federal court is so hamstrung by New York's parochialism as my brothers think it to be; one of the very purposes of federal jurisdiction is to protect against state policies that fail to recognize the extent to which the many have become one. Spanos' services were rendered in the prosecution of a federal claim in the same federal district court where he is seeking to recover the fee his client

8. Spanos did apply and was admitted to appear specially in the District Court for the Eastern District, but the record does not reveal when this occurred or the nature of the cases.

1. He continued that "as one strong decision is a precedent for another a little stronger, the law at last, on some matters, becomes such a nuisance that equity intervenes, or an Act of Parliament must be passed to sweep the whole away." Senior, Conversations with Distinguished Persons 314 (1880 ed.), quoted in Pound, Mechanical Jurisprudence, reprinted in Landmarks of Law 101, 103–04 (1960).

promised him. When that court has chosen to do now what it would assuredly have done if Skouras' bevy of New York lawyers had seen to it that their California brother had earlier sought admission *pro hac vice,* I see no reason why we should interfere. And, as my brothers agree, once Spanos has been so admitted, the supremacy clause insulates him from New York decisions drastically limiting the permissible activity of out-of-state attorneys.

I would allow Judge Wyatt's fair and sensible decision to stand.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

On Reconsideration in Banc

FRIENDLY, Circuit Judge.

The panel that heard this appeal, consisting of Chief Judge Lumbard, Judge Smith and the writer, found no merit in any of the defendants' challenges to the judgment below in favor of Spanos except the claim, which the majority sustained over my dissent, that the contract for his legal services violated § 270 of the New York Penal Law, McKinney's Consol.Laws, c. 40, condemning the unlicensed practice of law, as recently construed in Spivak v. Sachs, 16 N.Y.2d 163, 263 N.Y.S.2d 953, 211 N.E.2d 329 (1965). We later ordered that the appeal be reconsidered *in banc;* the parties were given leave to file additional briefs and bar associations were permitted to file *amici* briefs on the defense of illegality.[1]

The conclusion of the full court differs from that of the panel.

In the first place, we think Judge Wyatt was correct in concluding that a right to recover could be predicated on Rule 3(c) of the District Court for the Southern District of New York providing that "[a] member in good standing of the bar of any state * * * may upon motion be permitted to argue or try a particular cause in whole or in part as counsel or advocate." The contract engaging Spanos to work on the suit for damages under the antitrust laws, 15 U.S.C. § 15, which defendants proposed to bring in the Southern District can fairly be construed as contemplating court appearances on his part. When the defendants engaged him to that end, they impliedly assumed the obligation of having their New York lawyers in the action make any motion that was necessary to render such appearances lawful. There is not the slightest reason to suppose that if by their lawyers defendants had sought admission *pro hac vice* for the colleague whose services they had been at such pains to secure, the motion would have been denied; Judge Wyatt found that Spanos "is well trained in law and is a member in good standing of the California bar," that there was no suggestion of any unlawyerlike conduct on his part, and that accordingly it "cannot seriously be doubted that at any time on motion, the admission of Spanos *pro hac vice* would have been authorized by this Court." 235 F.Supp. 1, at 11. Compare Schifrin v. Chenille Mfg. Co., 117 F.2d 92 (2 Cir.), cert. denied, 313 U.S. 590, 61 S.Ct. 1114, 85 L.Ed. 1545 (1941); Atchi-

1. The positions of the bar associations differ. The Association of the Bar of the City of New York urges affirmance on the broad ground that an attorney licensed in one state may not constitutionally be forbidden to advise with respect to a federal claim in another. The Federal Bar Association of New York, New Jersey and Connecticut advocates affirmance on the grounds that Spanos was acting under the supervision of licensed New York attorneys and that defendants are estopped to question the regularity and propriety of his position. The New York County Lawyers' Association opposes the idea that an attorney licensed by another state may lawfully give independent advice as to federal matters in New York without having regularized his position through admission *pro hac vice* or otherwise, but suggests that the record may support a finding that Spanos was at all times working under the direction, control and supervision of one or more members of the New York bar and, if so, there would be no illegality. The New York State Bar Association supports the decision of the panel majority.

son, T. & S. F. Ry. v. Jackson, 235 F.2d 390 (10 Cir. 1956). We cannot accept the contention that if such leave to appear had been sought and granted, Spanos could recover only for court appearances and not for other legal work in the suit; under 28 U.S.C. § 1654, stemming from § 35 of the First Judiciary Act, 1 Stat. 92 (1789), the grant of leave would have given official recognition to his status as an attorney in the district for all purposes of the action and would have insulated him from § 270 of the New York Penal Law with respect to any legal services reasonably incident to the activities the District Court had authorized. Spanos' contract was thus susceptible of being lawfully performed without his being admitted to the New York bar and cannot be considered an illegal bargain. Such is the holding of Tuppela v. Mathison, 291 F. 728 (9 Cir. 1923), and Cochran v. Burdick, 63 App.D.C. 150, 70 F.2d 754, cert. denied, 293 U.S. 561, 55 S.Ct. 73, 79 L.Ed. 661 (1934). See also In re Waring's Estate, 47 N.J. 367, 221 A.2d 193 (1966). Cf. 56–70 58th St. Holding Corp. v. Fedders-Quigan Corp., 5 N.Y.2d 557, 186 N.Y.S.2d 583, 159 N.E.2d 150 (1959); Cochran v. Hurth, 29 Ohio App. 305, 163 N.E. 560 (1927). Defendants could not render the contract unlawful and unenforceable by discharging Spanos and thereby cutting off his opportunity to validate his status through *pro hac vice* admission in the industry suit before a court appearance on his part. "One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." 3A Corbin, Contracts § 767, at 540 (1960); E. I. DuPont de Nemours Powder Co. v. Schlottman, 218 F. 353 (2 Cir. 1914), cert. denied, 235 U.S. 705, 35 S.Ct. 382, 59 L.Ed. 434 (1915); George W. Garig Transfer, Inc. v. Harris, 226 La. 117, 75 So.2d 28 (1954); Wissahic-kon Realty Corp. v. Boyle, 385 Pa. 198, 122 A.2d 720 (1956); 5 Williston, Contracts § 1293A (rev. ed. 1937).

While this would suffice to dispose of the case, the importance of the problem and the desirability of furnishing guidance to the bar lead us to consider other grounds that have been urged for affirmance. The New York County Lawyers' Association suggests that Spanos may have acted under the control and supervision of duly admitted New York attorneys who alone were responsible to the client, in a status resembling that of the unlicensed law clerk which has never been supposed to violate § 270 in the absence of court appearance or a holding out as the giver of independent legal advice. It is clear there was no thought of Spanos being the sole lawyer in the industry suit. Defendants' initial proposal was that he prepare the case for trial by Eugene Sherpick, a prominent New York trial lawyer; Spanos agreed to come to New York only on the understanding that he was to be associated with Dean Landis whom he wanted to be his "link to this case"; and when Mr. Sherpick and Dean Landis formally withdrew in 1956, the agreement between the defendants and Mr. Weisman's firm for continuing the litigation stated that the firm should "have the aid and cooperation of Nick Spanos." On the other hand, the record would not support a conclusion that Spanos' relations with the New York lawyers bore any real analogy to that between a law clerk and his employer. Spanos felt free to criticize the New York lawyers to the client and insisted he "was to have a status in the case full and equal with that of every other lawyer," including Mr. Sherpick and Dean Landis; moreover he was generally paid, and ultimately discharged, not by any of the New York lawyers but by the defendants, and claimed an attorney's lien. We find it unnecessary, however, either to determine precisely what the relationship was or to endeavor to predict whether the New York Court of Appeals would consider Spanos' conduct within the condem-

nation of § 270 of the Penal Law. For we hold that under the privileges and immunities clause of the Constitution no state can prohibit a citizen with a federal claim or defense from engaging an out-of-state lawyer to collaborate with an in-state lawyer and give legal advice concerning it within the state.

■ We recognize that the guarantee against abridgment of the privileges and immunities of citizens of the United States could lend itself to "mischievous uses" if its scope were not confined to those interests "growing out of the relationship between the citizen and the national government, created by the Constitution and federal laws," Adamson v. People of State of California, 332 U.S. 46, 61, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Frankfurter, J., concurring); Colgate v. Harvey, 296 U.S. 404, 444, 56 S.Ct. 252, 266, 80 L.Ed. 299 (1935) (Stone, J., dissenting), overruled, Madden v. Commonwealth of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); and we note the "judicial reluctance to expand the content of national citizenship * * * due to a fear of creating constitutional refuges for a host of rights historically subject to regulation." Bell v. State of Maryland, 378 U.S. 226, 250, 84 S.Ct. 1814, 1827, 12 L.Ed.2d 822 (1964) (opinion of Douglas, J.). We are persuaded, however, that where a right has been conferred on citizens by federal law, the constitutional guarantee against its abridgment must be read to include what is necessary and appropriate for its assertion. In an age of increased specialization and high mobility of the bar, this must comprehend the right to bring to the assistance of an attorney admitted in the resident state a lawyer licensed by "public act" of any other state who is thought best fitted for the task, and to allow him to serve in whatever manner is most effective, subject only to valid rules of courts as to practice before them. Cf. Lefton v. City of Hattiesburg, 333 F.2d 280, 285 (5 Cir. 1964). Indeed, in instances where the federal claim or defense is unpopular, advice and assistance by an out-of-state lawyer may be the only means available for vindication. The broadening of district court rules as to admission suggested in the dissenting opinion is no adequate solution. The federal matter on which the help of a non-resident specialist is sought may be pending in a different state or may not be a suit at all, and specialized legal advice may be needed without the delay or expense incident to admission by a federal court before which the attorney may not have any intention of practicing, even if that were available and would afford sufficient validation. Having exercised their constitutional right to obtain the expert legal assistance on their antitrust claim which they desired, defendants cannot be heard to object to paying the bill.

Here, beginning with a paper written while still in law school, Spanos had concentrated on antitrust problems in the motion picture industry—a subject requiring detailed knowledge both of the decisions and of complex business practices; it was the knowledge and skill thus acquired that the defendants wished to bring to the aid of their New York attorneys in preparing the antitrust suit. Under the Constitution we perceive no basis on which New York could throw up a significant block to such assistance, for example, by making it a crime to engage in more than a one or two day consultation within its borders and insisting that examination of defendants' files, interviewing of witnesses and other time-consuming tasks essential to the rendition of proper legal advice and the effective pursuit of the antitrust claims should either be left to New York lawyers or be performed at great inconvenience where New York's writ does not run. The problem is by no means limited to antitrust litigation; similar requirements for specialized legal services frequently arise as to federal rights relating to such esoteric subjects as income taxation, patents, copyrights, trademarks, and securities and labor regulation. If a corporation operating across state lines wishes a particular lawyer or firm of lawyers to supervise the handling of all its prob-

lems in one of such fields, we do not see how a state can constitutionally insist that a local manager come to the expert, bearing bales of papers with him, rather than *vice versa*. Although in Sperry v. Florida, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), the Court was not required to go so far, our decision accords with the decision's major thrust —that Florida could not require its inventors desiring the help of patent specialists to betake themselves and their materials to the District of Columbia.[2] See also Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 7, 84 S.Ct. 1113, 12 L.Ed. 2d 89 (1964).

The Association of the Bar of the City of New York urges us to take an even broader ground that would render the participation of a licensed in-state lawyer irrelevant. A good deal can be said for such a position; for example, in the case just put of the corporation having nationwide operations, it would seem absurd that when the out-of-state trademark specialist goes to a local branch, he should be required to obtain the assistance of a resident general practitioner for whose views he would have little regard. Yet there is also a case for the other side. The disparity in requirements for admission to the bar gives a state maintaining high qualification standards some interest in seeing that its residents do not take action even on a federal right solely on the advice of a lawyer from another state; moreover, what is basically a federal claim or defense may depend in part on an "issue or claim which has its source in state law." Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 541 n. 1 (2 Cir. 1956). We thus limit our holding to the situation here presented, where a citizen has invited a duly licensed out-of-state lawyer to work in association with a local lawyer on a federal claim or defense. Whether § 270 of

the New York Penal Law could apply if the client in such a case dispensed with the local attorney or if the matter were one in which federal jurisdiction rested only on diverse citizenship, are questions better left to another day. And we in no way sanction a practice whereby a lawyer not admitted to practice by a state maintains an office there and holds himself out to give advice to all comers on federal matters.

The judgment of the District Court in favor of Spanos is affirmed.

HAYS, Circuit Judge (concurring in the result).

I subscribe to the position taken in the amicus brief of the Association of the Bar of the City of New York. If Section 270 of the New York Penal Law is correctly construed to prevent Spanos' giving advice in New York on federal law, whether with or without the collaboration of a New York lawyer, then the Section is invalid under the privileges and immunities clause of the Constitution.

LUMBARD, Chief Judge, with whom J. JOSEPH SMITH, Circuit Judge, concurs (dissenting).

I adhere to the views previously expressed, and would reverse the judgment for the plaintiff.

Spanos admittedly was practicing law in New York during the five years he prepared the industry suit for Skouras, under a direct arrangement with Skouras and in collaboration with the other attorneys also retained by Skouras.

D

Spanos was not admitted to practice law in New York by the New York courts. Therefore he may recover only if he was admitted to the federal court of the district where the litigation was in progress or if he obtained leave to practice in the particular case. He did neither.

---

2. We read the Chief Justice's qualifying statement that "in the absence of federal legislation, it [Florida] could validly prohibit *nonlawyers* from engaging in this circumscribed form of patent practice," 373 U.S. at 383, 83 S.Ct. at 1325 (emphasis added), to mean exactly what it says.

For reasons which are set forth in the majority opinion for the panel, the federal court sitting in New York ought to honor the strong public policy of New York and the failure to comply with the rules of the Southern District, by refusing to permit recovery of any additional fees not already paid.

Judge Friendly's opinion now supports recovery on the theory that no state can prohibit a citizen with a federal claim from engaging an out-of-state lawyer to collaborate with an in-state lawyer because of the privileges and immunities clause of the Constitution. No necessity is shown for this unprecedented application of privileges and immunities; to apply it here tortures a concept which has nothing to do with the issues before us. New York has not prohibited Skouras from retaining Spanos. Indeed, no one has interfered with Skouras retaining Spanos. Obviously Skouras is not complaining here.

The fact that Spanos is an out-of-state lawyer was not the reason he was not admitted here. The reason was that he did not make application in accordance with the Southern District Rules. All he had to do was make his application which would probably have been granted. But we ought not to attempt to correct this omission years later by any nunc pro tunc blessing. The power of the district courts to require applications for admission and to regulate admissions is not unimportant. The opinion of the majority would seem to reduce to zero the power of any court in New York, state or federal, to exercise any control over who practices law in New York where the legal advice sought concerns a "federal claim or defense," a test which is broad enough to include almost anything in these days of ever-burgeoning federal jurisdiction. Surely it cannot be seriously questioned that courts ought to have the power to regulate who practices before them for their own protection and that of litigants. There is an orderly and well-defined way in which the courts handle these matters; Spanos here chose not to follow it.

If the bar is disturbed because the fee for advice on federal matters given away from a lawyer's home state may not be collectible, then the bar should urge the judges of the Southern District to change the present rule to permit general admission to all out-of-state attorneys. (Of course even this would not help those who, like Spanos, neglect to avail themselves of local rules of practice.) As presently written the rule permits such general admission only to New York, Connecticut and Vermont lawyers. See footnote 6 of my first opinion which points out that at least twenty federal district courts permit general admission to out-of-state lawyers. The Western and Northern Districts of New York have already provided for such general admission for out-of-state lawyers. Where there is any need for a more liberal admission policy there is no reason to doubt that the judges of any district court will give proper consideration to adopting appropriate provisions in the rules of their court.

Apparently the majority would leave the more than 2000,000 out-of-state lawyers from the forty nine other states free to practice federal law in New York without any regulation whatever—none from New York, and none from any federal court, until it was time to appear at trial. This decision would seem to mean that an attorney admitted to practice in any state has an unrestricted license to practice federal law and give advice on federal law in all other forty nine states. I doubt whether many states make much, if any, inquiry, as to what, if anything, applicants to their bar may know about federal law. Thus out-of-state lawyers advising in whole or in part on federal law would seem well advised not to apply for state admission or for federal court admission and thus avoid all possibility of supervision or check.